# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ANTHONY WHITE,** | : | **CIVIL CASE NUMBER:** |
| *Plaintiff*, | : | |
| **v.** | : | **3:15-cv-01501-VLB** |
| | : | |
| **SMITHS MEDICAL ASD, INC.,** | : | **October 27, 2017** |
| *Defendant*. | : | |

## MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 31]

Plaintiff Anthony White ("White" or "Plaintiff") brings his unlawful employment termination action, alleging discrimination based on disability in violation of Conn. Gen. Stat. 46a-60(a)(1), as well as interference and retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*[1] Defendant Smiths Medical ASD, Inc. ("Smiths" or "Defendant") has moved for summary judgment on all grounds. For the foregoing reasons, the Court GRANTS summary judgment as to the federal claims and withholds from exercising jurisdiction as to the state claim.

---

[1] **The Court dismissed White's retaliation claim brought under Conn. Gen. Stat. § 34-290a, for failure to state a claim upon which relief may be granted. *See* [Dkt. 25 (Order on Mot. Dismiss)].**

## I.   Factual Background[2]

Smiths is a "leading global provider of medical devices for the hospital, emergency, home and specialist environments."  [Dkt. 31-2 (D. Conn. L. R. 56(a)(1) Stmt.) ¶ 1; Dkt. 34-2 (D. Conn. L. R. 56(a)(2) Stmt.) ¶ 1].  Smiths has a manufacturing facility in Southington, CT, which manufactures a variety of devices, including intravenous catheters.  [Dkt. 31-2 ¶¶ 4-5; Dkt. 34-2 ¶¶ 4-5].  White was employed at the Southington facility from 1976 until October 2014.  *See* [Dkt. 31-2 ¶¶ 10, 14; Dkt. 34-2 ¶¶ 10, 14].  In 1976, he began working for Johnson & Johnson as a machine operator but was promoted over the years and worked as a manufacturing team leader when Smiths Medical took over the facility in 2005.  *See* [Dkt. 31-2 ¶ 10; Dkt. 34-2 ¶ 10].  Although Smiths' job description for the team leader position required a Bachelor's Degree, which White did not have, Smiths grandfathered White into the position due to his many years of experience.  [Dkt. 31-2 ¶¶ 12-13; Dkt. 34-2 ¶¶ 12-13].  White remained at this position until his termination on October 24, 2014.  [Dkt. 31-2 ¶ 14; Dkt. 34-2 ¶ 14].

In 2009, White's performance began to fall below a satisfactory level.  *See* [Dkt. 31-2 ¶ 15; Dkt. 34-2 ¶ 15].  This poor performance was documented in his 2009/10 annual performance review, wherein he received an overall score of 2 out of 5 from

---

[2] The following undisputed facts are drawn primarily from the parties' D. Conn. Local Rule 56(a) Statements unless otherwise noted.  The Court has reviewed White's 56(a)1 Statement to ensure "that each statement is, in fact, supported by admissible evidence."  *See Wilson v. McKenna*, No. 3:12-cv-1581 (VLB), 2015 WL 5455634, at *1 (D. Conn. Sept. 15, 2015) (observing that the failure to oppose summary judgment does not relieve the Court of its duty of ensuring that the moving party offers admissible evidence in support of its motion).

his evaluator, Richard Girard ("Girard"). [Dkt. 31-10 (Mot. Summ. J. Ex. G, 2009/10 Performance Review) at SM000212, -25]. The overall score is measured as follows:

1. "Performance does not meet the requirements of the position in several area and immediate improvement is required (Objectives & Behaviors)."

2. "Performance meets the requirements of the position, but improvement is needed in one or more areas (Objectives & Behaviors)."

3. "Performance consistently meets the requirements of the position (Objectives & Behaviors)."

4. "Performance exceeds the requirements of the position in one or more areas (Objectives & Behaviors)."

5. "Performance consistently exceeds the requirements of the position in all areas (Objectives & Behaviors)."

*Id.* at SM000225-26; [Dkt. 31-11 (Mot. Summ. J. Ex. H, 2010/11 Performance Review) at SM000241; Dkt. 31-12 (Mot. Summ. J. Ex. I, 2011/12 Performance Review) at SM000255-56; Dkt. 31-13 (Mot. Summ. J. Ex. J, 2012/13 Performance Review) at SM000271]. White commented, "Even though I am not 100% agreeable with my overall rating of (2), I understand the rational[e] behind this decision. The rating reflects that as a 'Team' we did not hit our 'Smiths Southington' overall objectives for the 2009/2010 fiscal year." [Dkt. 31-10 at SM000225].

White's overall performance ranking declined to 1 in his 2010/11 annual review, which Girard also administered. [Dkt. 31-11 at SM000229, -41]. White indicated in the Reviewee's Comments section,

> I have received feedback regarding my fiscal year performance, my response can only be that of deep hurt and utter disappointment. Although I could respond to all of the observations documented related to my performance, I realize that it would be futile, it [sic] just difficult for me [to] understand that with all the responsibilities that have been assigned to the MTL's over the many years, it appears that

**know [sic] one is paying attention to the accomplishments, at least in my case. Furthermore, it is without any doubt that over the past thirty-five years of service, I have developed a deep appreciation for this organization and I will do whatever necessary to maintain our successful [sic] in the business, if this requires that I submit to participating with a "Improvement Plan" then I welcome it.**

*Id.* at SM000240. The following year, 2011/12, Jeff Bowen ("Bowen") reviewed White and gave him an overall rating of 2. [Dkt. 31-12 at SM000244, -255]. White did not provide any written comments. *See id.* at SM000254. White also received an overall score of 2 in his 2012/13 review, administered by Daniel Garcia ("Garcia"). [Dkt. 31-13 at SM000259, -70]. White commented, "Although I am not in agreement with my final ra[t]ing for 2012/2013, I understand the challenges we face in our leadership position here at Smiths. It is quite clear to me that it is critical to work one-on-one with my manager weekly to determine if I am meeting the organization needs required to drive this business forward." *Id.* at SM000269.

Garcia and Jim Goodrich ("Goodrich") from the Human Resources department, placed White on a performance improvement plan ("PIP") on January 16, 2014. [Dkt. 31-14 (Mot. Summ. J. Ex. K, PIP 1/16/14)]. The PIP cites White's four consecutive years of scoring a 1 or 2 on his overall annual performance. *Id.* at SM000377. The PIP identified several "areas of opportunity" from the performance reviews that consistently needed improvement: (1) completing documentation for the Quality Department; (2) following company safety incident reporting procedures; (3) clearly communicating to staff and management; and (4) improving behavioral competencies by quickly developing a knowledge of company procedures and policies, increasing productivity, and meeting deadlines. *Id.* at SM000377-80. White refused to sign this document. *Id.* at SM000381.

On May 2, 2014, Garcia issued a 90-day follow-up of White's PIP from January. [Dkt. 31-16 (Mot. Summ. J. Ex. M, 90-day Follow-Up PIP 5/2/14)]. White received a "meets" rating for the first three areas of improvement, but he received a "needs improvement" for the fourth. Specifically, Garcia noted that White (1) submitted all documentation to the Quality Manager by his deadline; (2) reported safety incidents in a timely fashion; and (3) participated in Gemba meetings and made positive contributions, and timely communicated quality issues to Garcia. *Id.* at SM000382. However, with respect to his behavioral competencies, Garcia noted White overscheduled "PTO time," which impacted component inventories; he continuously erred in entering his payroll data; and he "still needs to work on driving self-directed productivity/quality initiatives while balancing day to day work activities." *Id.* at SM000382-83. He did, however, volunteer to take a "6s project in the Extrusion dept.," which "was well organized an on time." *Id.* at SM000383. Overall, Garcia opined that "[d]uring this 90 day time frame, Tony has improved in some of the categories but has also slipped on others," and elected to extend the 90-day PIP until the end of July. *Id.* The parties did not submit into evidence an additional 90-day PIP follow-up from July.

White received an injection for his back pain in at some point prior to August 2014. [Dkt. 34-3 at 154:25-155:24 (testifying he received a shot in June or July of 2014); Dkt. 35-1 (Reply Ex. Y, Medical Records) at WHITE_PSR_000011 (documenting on 8/4/14 that White had previously received a cortisone shot)]. He went to Rehab Dynamics on August 4, 2014, wherein he was recommended for physical therapy 2-3 times a week for 4-6 weeks. [Dkt. 35-1 at WHITE_PSR_000011-

12]. Dr. Hilary Onyiuke, MD and Larua LaBarbera, PA-C, referred White to Rehab Dynamics. *Id.*

On August 11, 2014, Garcia emailed Goodrich and Bowen suggesting two options for White: termination or "re-assignment to a Team Tech position with a reduction of pay to the higher end of the scale or wage freeze." [Dkt. 31-18 (Mot. Summ. J. Ex. O, Email 8/11/14)]. In early September 2014, Goodrich began communicating with Mary Ranalla, who was Human Resources Manager Delivery Lead at Smiths' headquarters in Minnesota during this time. *See* [Dkt. 31-4 (Mot. Summ. J. Ex. A, Ranalla Decl. and Attachments) ¶ 3, Attachment 1 at SM000398]. With respect to the pending PIP, Ranalla stated, "I am a little confused why a January PIP has gone on through August. I see there was a 90 day extension given but still, it's disappointing this has taken so long to have action plus the rationalizing for the extension is weak." [Dkt. 31-4 at SM000398]. Ranalla also stated,

> He appears to meet most of the expectations but there is the lone comment at the end that he has slipped in some areas. There is no explanation as to what has slipped. That should have been caught and coached to explain more there. Under driving productivity the final notice states there were no self-directed projects however in the 90 day it references how he volunteered for a 6s projects and it went well. That doesn't seem to align, or what am I missing? What exactly is meant by a self-directed productivity project as it seems like that may not be clear. If the PTO and payroll issues are the biggest deal, can we move him into a role where he's not responsible for that? If not, please explain what the true issues are.

*Id.* Goodrich did not respond, and Ranalla followed-up on September 21 requesting a report on White. *Id.* at SM000394.

Smiths created a Performance Employee Evaluation for 2013/14 (undated), which evaluates White on competencies similar to the aforementioned annual reviews. *See* [Dkt. 31-17 (Mot. Summ. J. Ex. N, 2013/14 Review)]. The report indicates White received a range of ratings from 1 to 3 on specific categories and an overall ranking of 1: "Does not meet the requirements for the role." *Id.* at SM000290. White circulated on September 29, 2014, an email to Garcia, Goodrich, and Bowen, attaching a document titled "Performance Accomplishments," [Dkt. 31-19 (Mot. Summ. J. Ex. P, Email 9/24/14)], wherein he acknowledged his receipt of a 2014 review, stating,

> Gentlemen, again for the 2014 review period I have been given a less then [sic] acceptable review, I have mention[ed] in past reviews that it feels as if I have been placed in a "Pigeon Hole" and regardless of what I accomplish in my present role, the end result will be an identical "O." The verbal communication given to me pertaining "Why" I was rated as "needs improvement in more than one area" is not substantial enough to rate me so low. Below, you will find what I feel are great accomplishments for this for the business and my team.

*Id.* at SM000373. White then listed his perceived accomplishments in sectors of "Productivity," "Quality," and "Other Project work / Safety Initiatives."[3] *Id.* at SM000372-74.

On October 1, 2014, at 9:55 AM, Ranalla followed-up with Goodrich again regarding his failure to respond to her inquiry about White. [Dkt. 31-4 at SM000394]. Ranalla stated, "I never did hear back from you on this and now I see it's the person you are thinking of downsizing." *Id.* She clearly stated that she "do[es] not support this being a reduction in force for Tony White" and that she was "unclear why he

---

[3] The submitted document contains comments about each bullet point he listed, although it is unclear who edited the document thereafter

is still with the organization given the performance and the PIP." *Id.* At 11:11 AM, Goodrich emailed Ranalla, indicating Goodrich, Bowen, and Garcia had met to discuss White's employment and "finalized the decision not to consider moving Tony to a technician position," indicating the termination date would be set once Ranalla felt "comfortable that [they] can move forward." [Dkt. 31-20 (Mot. Summ. J. Ex. Q, Email 10/1/14); Dkt. 31-4 (Mot. Summ. J. Ex. A, Ranalla Decl.) ¶ 3. Ranalla responded at 1:46 PM declaring she was "not the deciding factor in the termination," the PIP "went on too long and wasn't managed properly," and that she is "sure he's well respected, however, our concern is the performance and the negative impact on the business and morale." [Dkt. 31-4 at SM000392]. Ranalla indicated only Goodrich needed to have the termination meeting with White and set up a time to discuss the matter "next week." *Id.*

That same day, Garcia created a Final Review Follow-up to his January 2014 PIP. [Dkt. 31-21 (Mot. Summ. J. Ex. R, Final Follow-Up PIP 10/1/14)]. The review outlined White's rating of "Needs Improvement" in "Plant Related Quality Documentation" as well as "Behavioral Competencies." *Id.* at SM000297. The review did not discuss other aspects of performance typically found in past reviews. Garcia concluded that his consistent overall performance of "Needs Improvement" during the past several months, in consideration with his past sub-par reviews dating back to 2012, leads him to the "recommendation that Tony's job skills do not meet the current requirements of the Manufacturing Team Leader position" and that his "job assignment will be ending here at Smiths Medical." *Id.* at SM000297-98. On October 2, 2014, Goodrich circulated the "Final Review Write-

up" to Ranalla, referencing efforts he and Garcia had made to improve White's performance to no avail and "strongly recommend[ing] that the Legal Department review our decision and documentation as he is in a protected class – both by age and race." [Dkt. 31-22 (Mot. Summ. J. Ex. S, Email 10/2/14)]. From October 8 through October 22, 2014, Goodrich, Garcia and Bowen worked together to finalize the Final Review PIP. *See* [Dkt. 31-4 at SM000408-13]. On one occasion Ranalla expressed her frustration at the speed for finalizing the review, stating, "I need to trust the people in the site can manage these types of ER issues and as you will recall I stated I did not want to micro manage this situation." *Id.* at SM000411 (sending email October 12, 2014).

While the PIP finalization process remained ongoing, White circulated an email on October 10, 2014, to Garcia, CC'ing Goodrich, wherein he wrote one sentence: "I spoke briefly with you about my possible surgery in November 2014, here is confirmation about the procedure." [Dkt. 31-23 (Mot. Summ. J. Ex. T, Email 10/10/14)]. The attachment indicates White is "scheduled for surgery" (the type is not specified) with Dr. Onyiuke on November 10, 2014[4], and that he has a pre-op physical on October 17 and another appointment on October 28, 2014. *Id.* at SM000310. Garcia and Goodrich deny knowledge of his back ailments, but they do not deny receiving this email. *See* [Dkt. 31-2 ¶ 65; Dkt 31-15 (Mot. Summ. J. Ex.

---

[4] The attachment states the surgery will occur on November 10, 2015. However, all parties agree that the surgery was set for November 10, 2014, and "2015" is a typographical error. *See* [Dkt. 31-2 ¶ 57; Dkt. 34-2 ¶ 57].

L, Garcia Dep.) at 116:8-19; Dkt. 31-24 (Mot. Summ. J. Ex. U, Goodrich Dep.) at 9:23-97:25; Dkt. 32-4 ¶ 65].

White testified that on October 20, 2014, he asked Goodrich for the phone number of Sedgwick, (the company that "handled the disability") and received the number, but he did not get the opportunity to call Sedgwick and arrange for his surgery.  [Dkt. 31-2 ¶ 67; Dkt. 34-2 ¶ 67; Dkt. 34-3 at 168:20-170:2].  On October 24, 2014, the Final Review Follow-up was finalized, [Dkt. 31-26 (Mot. Summ. J. Ex. W, Final Follow-up PIP 10/24/14)], and Smiths terminated White's employment, [Dkt. 31-27 (Mot. Summ. J. Ex. X, Separation Processing Form) at SM000307].

## II.  Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no genuine factual disputes exist.  *See Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) (citing *Gottlieb*, 84 F.3d at 518); *see Martinez v. Conn. State Library*, 817 F.Supp.2d 28, 37 (D. Conn. 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

III.   <u>Analysis</u>

Smiths moves for summary judgment on all three remaining counts: (1) disability discrimination in violation of Conn. Gen. Stat. § 46a-60(a)(1); (2) interference with rights provided by the FMLA, 29 U.S.C. § 2615(a)(1); and (3) retaliation for pursuing rights under the FMLA, 29 U.S.C. § 2615(a)(1). The Court addresses the FMLA claims first as they are dispositive of this case.

## A. *FMLA Claims*

The FMLA provides an "eligible employee" with the right to take 12 weeks of unpaid leave for, *inter alia*, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA prohibits employers from interfering with this right and from retaliating against an employee who asserts this right. 29 U.S.C. § 2615(a)(1). Interference and retaliation claims are two distinct claims for relief. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). An "interference" claim is one in which "the employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017). In contrast, a "retaliation" claim involves a situation where the employee "actually exercis[es] [his] rights or oppos[es] perceived unlawful conduct under the FMLA and then [is] subjected to some adverse employment action by the employer." *Id.* The two claims provide *ex ante* and *ex post* protections for the employee, respectively. *Id.*

### 1. *Interference with Rights Provided by the FMLA*

The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). To prevail on an FMLA interference claim, "a plaintiff must establish: 1) that [ ]he is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that [ ]he was entitled to take leave under the FMLA; 4) that [ ]he gave notice to the defendant of [his] intention to take leave; and 5) that [ ]he was denied benefits to which [ ]he was

entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). Smiths challenges only steps four and five for the purposes of this motion.

### i. Notice

Smiths disputes the sufficiency of White's notice provided in an email dated October 10, 2014. White contends he communicated his intention of taking leave on September 2014 "shortly after July 31, 2014, when Dr. Onyiuke recommended he have surgery," and again on October 10, 2014, when he sent an email about his scheduled surgery for November 10, 2014. [Dkt. 34-1 (Opp'n Mot. Summ. J.) at 17]. These two communications, White avers, constitute proper notice under the FMLA.

The notice requirement is governed by 29 U.S.C. § 2612(e)(2), which provides in relevant part that where leave for a serious health condition "is foreseeable based on planned medical treatment, the employee . . . shall provide the employer with 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave under such subparagraph, except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(2)(B); *see* 29 C.F.R. § 825.302; *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 381 (2d Cir. 2017) (applying 29 U.S.C. § 2612(e)(2) to an FMLA interference case). White's two purported notices were delivered within the 30-day requirement, assuming FMLA leave would start on the date of the surgery scheduled for November 10, 2014.

The Code of Federal Regulations outlines the content required to establish sufficient notice. "An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave and otherwise satisfy the notice requirements set forth in § 825.302 or § 825.303 depending on whether the need for leave is foreseeable or unforeseeable." 29 C.F.R. § 825.301(b). Section 825.302, "Employee notice requirements for foreseeable FMLA leave," applies in this instance because White's need for surgery was foreseeable as noted above. When giving notice, an employee "must explain the reasons for the needed leave so as to allow the employer to determine whether the leave qualifies under the Act." *Id.*

Under 29 C.F.R. § 825.302(c), an employee must provide "at least verbal notice sufficient to make the employer aware that the employee needs FMLA–qualifying leave, and the anticipated time and duration of the leave." Although the circumstances requiring FMLA leave can impact the content needed, relevant examples of sufficient information include "that a condition renders the employee unable to perform the functions of the job;" "that the employee . . . has been hospitalized overnight;" "whether the employee or the employee's family is under the continuing care of a health care provider;" and "the anticipated duration of the absence, if known." *Id.* An employee seeking FMLA leave for the first time "need not expressly assert rights under the FMLA or even mention the FMLA," but where FMLA has previously been given for the condition "the employee must specifically reference the qualifying reason for leave or the need for FMLA leave." *Id.*

White first contends he gave verbal notice to Goodrich at some point before September 2014, which he avers is the initial date for his surgery. [Dkt. 34-3 at 158:8-159:10]. Aside from his testimony, White has not presented any evidence that he was scheduled to have surgery in September of 2014 and the evidence on the record suggests that he was not.[5] To survive a motion for summary judgment, White must "come forward with specific facts showing that there is a genuine issue for trial," *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co.. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, (1986). Smiths denies that White informed him that he was scheduled to have surgery in September of 2014, but for the purposes of deciding this summary judgment motion and notwithstanding the scant evidence presented in support of his claim, the Court will assume arguendo that White did so advise Smiths as a court may not "weigh evidence or assess the credibility of witnesses" as these are decisions for the jury to make. *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 146 (2d Cir. 2012) (applying this principle to an FMLA case).

---

[5] During the deposition, defense counsel notified White that, to counsel's recollection, the medical records did not indicate surgery was scheduled for September 2014. *See id.* at 158:22-159:6. The parties have not submitted any medical records indicating he had a surgery scheduled in September 2014. Indeed, the only medical records from this time period are those of Rehab Dynamics, a physical therapy center. [Dkt. 35-1 at WHITE_PSR_000011]. Notes from August 4, 2014, state, "Patient will benefit from skilled physical therapy to increase range of motion, improve strength, decrease pain, increase flexibility, and improve function." [Dkt. 35-1 at WHITE_PSR_000011]. Rehab Dynamics notes from September 15, 2014, indicate White was administratively discharged after he attended five sessions, cancelled two appointments, and was a no-show to one appointment. *Id.* at WHITE_PSR_000013.

During this conversation, White claims he said, "Jim, I'm having a problem with my back" and "It's causing me to have, you know, excruciating pain, and it's gone back for some time." *Id.* at 160:14-161:2. White confirmed that he told Goodrich he would "eventually . . . have to go and get something done with it," and that Goodrich "said something about go ahead and get the note and just let us know. And then, obviously, we will go through the procedure." *Id.* at 161:17-21. Verbal communications can be sufficient under the Code of Federal Regulations, provided the notice of information: the needs for leave as well as the anticipated time and duration of the surgery. *See* 29 C.F.R. § 825.302(c). Assuming White made the verbal communication, his vague reference to needing "something done with" his back does not provide sufficient detail for a reasonable juror to conclude that Goodrich received notice of his need to take FMLA leave.

White's subsequent email sent on October 10, 2014, fares no better. He stated simply, "I spoke briefly with you about my possible surgery in November 2014, here is confirmation about the procedure." [Dkt. 31-23 at SM000309]. Surgeries vary greatly in intensity, duration, and time for recovery  The attached form does not indicate the type of surgery that is to be performed, nor does it provide detail on the duration of the surgery or length of time for recovery. *See id.* at SM000310. It also does not indicate how White might be "unable to perform the functions of the job," whether he will be "hospitalized overnight," or the "anticipated duration of the absence." 29 C.F.R. § 825.302(c). Without any reference to these matters or similarly detailed information in light of the prevalence of day surgery after which patients are able to resume normal activities

immediately after a procedure, it would be reasonable for an employer to conclude that that the surgery was minor and did not require FMLA leave. A plain reading of the Code of Federal Regulations makes clear that White's one-sentence email, indicating only that a surgery would occur on a specified date without stating that he would need to take leave or the duration of the leave, does not suffice to give a reasonable employer notice that the employee intended to take FMLA leave. *See* 29 C.F.R. § 825.302(c). Accordingly, White failed to give proper notice as required under this provision of the statute

As an alternative to § 825.302(c), the Code of Federal Regulations enables an employer to "require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.302(d). Such requirements can include the requirement that an employee "contact a specific individual," and any failure to comply with the employer's provisions can lead to the delay or denial of FMLA-protected leave. *Id.* "When planning medical treatment, the employee must consult with the employer and make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations, subject to the approval of the health care provider." 29 U.S.C. § 825.302(e). An employer may also waive the FMLA notice requirement. 29 U.S.C. § 825.302(g).

The parties have not submitted into evidence the employer's handbook or any other document outlining the existence of the employer's specific notice requirements under the FMLA. However, White acknowledges that Smiths'

employee handbook contains provisions orchestrating medical leave for hourly employees. [Dkt. 34-3 (Mot. Summ. J. Ex. A, White Dep.) at 25:11-20].

White admits he was familiar with the protocol for qualifying for FMLA benefits and administered the protocol in his managerial capacity. Specifically, White testified that, as a manager, when employees came to him with respect to medical leave he would "look at that book" and refer them to Goodrich if he did not understand the content. *Id.* at 26:5-14. Employees then filled out a form and he would forward specific medical information to Goodrich. *Id.* at 26:15-24. White also recalled that Sedgwick was the third party company that "handled the disability," and the procedure went as follows: "[Y]ou report to them. They would contact the doctor, find out dates and times, that sort of thing, and then that information would be given back to me. It would go through the HR manager first, and then he or she would give me a copy of it as the supervisor for that employee." *Id.* 26:25-27:9. White believed the process to be different for salaried employees but could not recall in what manner the difference existed. *Id.* 27:10-15. He testified that he believes Goodrich handled his leave in 2007 when he had a heart attack, his leave for foot surgery "because—remember now, Sedgwick was not the . . . original handler of this," and his back surgery. *Id.* at 27:17-23. Specifically, with respect to scheduling back surgery, White testified that Goodrich "said something about go ahead and get the note and just let us know. And then, obviously, we will go through the procedure." *Id.* at 161:18-21. White averred he thought the "procedure" meant "Sedgwick or whoever was covering the medical issues at the time." *Id.* at 161:22-162:1. Indeed, White's testimony indicates White knew his

employer required employees to work with Sedgwick when arranging FMLA leave. Neither party contends that Smiths waived a notice requirement. Accordingly, White's admitted failure to contact Sedgwick suggests he failed to give proper notice. *See id.* at 169:1-11; *see* 29 C.F.R. § 825.302(d) (allowing an employer to "require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances").

White's notice was also inadequate because it was reasonable for Smiths to have concluded that White was not giving notice of his need to take FMLA leave for three contextual reasons in addition to the technical inadequacy of the notice itself. First, White had previously taken FMLA leave and was familiar with the notice requirements. Second, White was a manager who was required to be familiar with and administer the company's FMLA policies and procedures when his subordinates qualified for or sought to take FMLA leave. Finally, as discussed further below, White notified his manager of his procedure and not the company's FMLA leave administrator.

The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided thereunder. 29 U.S.C. § 2615(a)(1). In this Circuit, an employee cannot maintain an FMLA interference claim unless the employee gave the notice required by his employer. Graziadio, 817 F.3d at 424. This Court can see how rigid adherence to this rule could deprive an employee of the right to redress a restraint on the exercise of rights under the FMLA. For example, an employer's notice procedure could be so

complex that an employee could find it difficult to give correct notice, or an employer could change its procedure so frequently that it would be difficult for employees to determine what procedure to follow. In such a situation, the employer could have actual or constructive notice of all the information necessary to constitute adequate notice even though the employee did not fully satisfy the employer's notice requirements. In such a case, substance should prevail over form and the employer's notice requirements should yield. The facts of this case do not present such a dichotomy where the purpose of a law is in conflict with the framework for its application. Here, the Plaintiff's brief conversation and email simply did not give notice that he either qualified for or wished to use FMLA benefits and taken in context suggested he was not giving such notice. Plaintiff's communications were inadequate in form and substance.

### ii. Denial of Benefits

Assuming White gave proper notice, his claim nonetheless fails because he has not established he was denied benefits to which he was entitled under the FMLA. Smiths argues it did not deny White leave because he did not yet request or attempt to exercise his rights under the FMLA. [Dkt. 31-1 at 32-33]. White acknowledges he did not formalize his FMLA leave with Sedgwick, and but he claims this is because his employment was terminated prior to him getting the opportunity to do so. *See* [Dkt. 34-3 at 168:20-169:19]. This argument is unavailing.

In *Thomsen v. Stantec. Inc.*, 483 F. App'x 620, 622-23 (2d Cir. 2012), *certiorari denied* ("*Thomsen*"), the Second Circuit issued a summary order upholding a district court's order granting summary judgment in favor of the defendant for an

FMLA interference claim, in which the defendant terminated the plaintiff's employment prior to plaintiff requesting FMLA benefits.  In this case, the "plaintiff took three extended leaves of absence for surgery, the first two of which were not taken pursuant to the FMLA" because plaintiff was not yet an eligible employee. *Thomsen v. Stantec, Inc.*, 785 F. Supp. 2d 20, 24 (W.D.N.Y. 2011); *Thomsen*, 483 F. App'x at 621 (adopting facts from district court decision).  The defendant held open his position during this absence, and the evidence did not indicate any additional requests were made let alone denied by the defendant, both before and after he became FMLA eligible.  *Thomsen v. Stantec, Inc.*, 785 F. Supp. 2d at 24.  The Second Circuit stated, "That his termination necessarily prevented him from taking *future* FMLA leave—which he had not yet requested, and had no plans to request—does not create an issue of fact as to whether Stantec attempted 'to interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided under' the FMLA." *Thomsen*, 483 F. App'x at 622-23.

In *Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 18 (D. Conn. 2016), Judge Stefan R. Underhill applied the *Thomsen* reasoning to a similar situation in which the plaintiff had not yet requested FMLA leave and did not "have any concrete plans to do so."  Judge Underhill granted summary judgment in favor of the defendant for failure to establish a denial of FMLA benefits, rejecting the plaintiff's argument that "her termination is itself a denial of her future use of FMLA benefits." *Id.*

The Court finds the facts of this case are similar to those set forth in *Thomsen* and *Hewett*.  It is not a situation in which a plaintiff validly requested

FMLA leave and then the defendant terminated the employment. *See, e.g., Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) ("We therefore hold that firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee."). White did not request leave through Sedgwick, which he acknowledges was the proper procedure for formally requesting FMLA leave. [Dkt. 34-3 at 168:20-169:19]. He also testified that Goodrich advised White to "get the note," "let us know," then "we will go through the procedure." *Id.* at 161:17-21. On October 10, 2014, White notified Goodrich and Garcia by email that he scheduled a date for surgery on November 10, 2014. *See* [Dkt. 31-23]. He could have contacted Sedgwick at any point after which he scheduled the surgery, including as early as October 10. White did not do this, however. That White argues he was terminated prior to having the "opportunity" to contact Sedgwick is not reflective of his ample opportunity and failure to schedule FMLA leave during this time. There is no evidence in the record that Goodrich or another Smiths staff discouraged him from requesting FMLA leave; on the contrary, Goodrich acknowledged a procedure existed for FMLA leave gave him the telephone number for Sedgwick upon request, thereby facilitating his navigation through the proper procedure. [Dkt. 31-2 ¶ 67; Dkt. 34-2 ¶ 67; Dkt. 34-3 at 161:17-21]. Accordingly, Smiths did not deny White FMLA benefits to which he was entitled and White fails on this ground as well.

2. *Retaliation for Pursuing Rights under the FMLA*

Section 2615(a)(1) also prohibits an employer from retaliating against an employee for exercising his FMLA rights. *Woods*, 864 F.3d at 167. The Second

Circuit analyzes FMLA retaliation claims under the *McDonnell-Douglas* test.  *See Graziadio*, 817 F.3d at 429; *Alexander v. Bd. of Educ. of City of New York*, 648 F. App'x 118, 121 (2d Cir. 2016) (summary order) (applying the *McDonnell-Douglas* test to a FMLA retaliation claim).

### i.  *Prima Facie* Case

Under the *McDonnell-Douglas* standard, the plaintiff must first demonstrate a *prima facie* claim, which requires proof of the following elements: "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168.

Smiths contends that summary judgment is warranted because White cannot establish the first and fourth elements of the *prima facie* case.  White relies largely on the temporal proximity between the time he allegedly requested FMLA leave "shortly after July 31, 201[4]" and August 11, 2014, when his employers began discussions about his termination.  [Dkt. 34-1 at 15-16].

The Court finds that White has failed to establish a *prima facie* case because he did not exercise rights protected under the FMLA.  As aforementioned, it is undisputed that White failed to contact Sedgwick, the organization tasked with organizing Smiths employees' FMLA leave and give actual notice as required.  In addition as concluded above, he did not give Smiths constructive notice of his qualification for or intent to take FMLA leave.  His *prima facie* case thus fails on

this element.[6]

ii. Legitimate, Non-Discriminatory Reason

Even assuming White were to have established the first step of the *McDonnell-Douglas* test, Smiths would be able to establish the second step, thus requiring White to sustain his burden of showing that its stated reason was a pretext to shield its retaliation. Poor performance is a legitimate, non-discriminatory reason for terminating a plaintiff's employment. *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (reversing on the grounds of sufficient pretext, but acknowledging district court held defendant had "seemingly legitimate, non-discriminatory reasons for firing [plaintiff]—primarily, poor performance reviews and affidavits from three regional managers whom [plaintiff] supervised); *Jain v. McGraw-Hill Cos., Inc.*, 506 F. App'x 47, 48 (2d Cir. 2012) (stating plaintiff's poor work performance was a legitimate, non-discriminatory reason for terminating plaintiff's employment in an FMLA case); *see also Forrester v. Prison Health Servs.*, No. 12 CV 363(NGG)(LB), 2015 WL 1469521, at *15 (E.D.N.Y. Jan. 5, 2015) ("Misconduct, excessive lateness, and poor performance are

---

[6] As a general matter, a plaintiff may rely on temporal proximity between the exercise of FMLA rights and the alleged retaliation to establish "an inference of retaliatory intent." *See Donnelly*, 691 F.3d at 152 (finding a "'very close' temporal proximity" is a sufficient basis to create a "causal connection" between the protected activity and adverse action, constituting retaliatory intent); *Hewett*, 171 F. Supp. 3d at 20 (acknowledging that a temporal proximity of one month was sufficient to satisfy the *prima facie* elements). However, in the retaliation context, the adverse action has to be in response to the exercise of a protected right. Here, since White failed to give notice, his termination could not be retaliation for exercising his FMLA rights and White cannot satisfy the fourth element of a *prima facie* case. Simply put, an employer cannot retaliate for something it does not know.

legitimate, non-discriminatory reasons for defendants' adverse actions."). Because the annual reviews document White's persistent poor performance dating as far back as 2009, the Court finds that Smiths has met its burden to establish a legitimate, non-discriminatory reason for termination.

### iii. Pretext

Given that there exists a legitimate, non-discriminatory reason for terminating White's employment, White would then have to show the "proffered explanation is pretextual." *Graziadio*, 817 F.3d at 429. A reasonable juror can conclude the employer's reason for termination is "pretext for a prohibited reason" when the plaintiffs provides evidence "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.* at 340 (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)). At the pretext stage, temporal proximity alone is insufficient to create a material issue of fact for the jury to decide. *See Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 19 (2d Cir. 2013) (ruling that a two-day temporal proximity between plaintiff's internal complaint and his removal from a project was sufficient to establish a *prima facie* case but insufficient to establish pretext) (citing *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 913, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.")); *Percoco v. Lowe's Home Ctrs., LLC*, 208 F. Supp. 3d 437, 449 (D. Conn. 2016).

For the purposes of the pretext analysis, the Court assumes *arguendo* that White notified Smiths of his intention to take FMLA leave "shortly after July 31, 2014." *See* [Dkt. 34-1 at 15-16]. White has not offered any viable evidence other than temporal proximity to support his claim for FMLA retaliation.

The record of White's persistent poor performance is well documented by Smiths and acknowledged by White who admitted his poor performance ratings were validly based. He admits his failure to hit the "Smiths Southington" overall objectives for the 2009/2010 fiscal year. [Dkt. 31-10 at SM000225]. In response to his 2010/11 annual review in which his ranking declined to 1, he acknowledged his need to participate in an improvement plan. [Dkt. 31-11 at SM000240]. In his 2012/13 review, he acknowledged his failure "to work one-on-one with [his] manager weekly to determine if [he is] meeting the organization needs required to drive this business forward." [Dkt. 31-13 at SM000269]. White was placed on an improvement plan which listed the areas in which he needed to improve. *Id.* at SM000377-80. These included developing knowledge of company policies and procedures, following safety procedures, clearly communicating with staff and management and improving productivity and meeting deadlines. [Dkt. 31-14 at SM000377-80]. Thereafter, he improved in some areas but declined in others and the improvement plan was extended an additional 90 days. [Dkt. 31-16 at SM000383]. He acknowledged that he was rated "needs improvement" in more than one area, questioned why that would warrant his being rated so low and pointed to his prior years' accomplishments. [Dkt. 31-19 at SM000372-74]. In September of 2014 Smiths regional human resource manager, who had no

knowledge of White personally, stated that the rationale for the extension of the performance plan was weak and she did not understand why he had not been terminated or demoted sooner.  [Dkt. 31-4 at SM000398].

His contention that staff considered but elected not to demote him and that they considered classifying his termination as "downsizing," *id.* at 12-13, is merely smoke and mirrors, for there is no link to his request for FMLA leave.   White therefore cannot show how these discussions constitute "weaknesses, implausibilities, inconsistencies, or contradictions" in Smiths' argument that poor performance is the reason for termination. *Graziadio*, 817 F.3d at 429.  As the Court has determined, White never noticed Smiths of his intention to take FMLA leave, and the evidence does not indicate staff even contemplated his health issues when deciding to terminate his employment.   Accordingly, White fails to establish a triable issue of fact regarding his FMLA retaliation claim.

### B. *Discrimination Under Conn. Gen. Stat. § 46a-60(a)(1)*

Because White's FMLA claims fail, the Court will not exercise jurisdiction over his state claim.

### IV.   Conclusion

For the aforementioned reasons, summary judgment is GRANTED as to the FMLA claims.  The Court declines to exercise jurisdiction over White's state law claim.  The case is REMANDED to the Connecticut Superior Court, Judicial District of New Britain.  The Clerk is directed to close this case.

**IT IS SO ORDERED.**

_____/s/_____

**Hon. Vanessa L. Bryant**

**United States District Judge**

**Dated at Hartford, Connecticut: October 27, 2017**